## THE GENEVA.

### POOR v. THE GENEVA.

*(District Court, W. D. Pennsylvania. January 28, 1886.)*

**1. CARRIERS OF PASSENGERS—ACTION TO ENFORCE PENALTY AGAINST STEAM-BOAT FOR CARRYING AN UNLAWFUL NUMBER OF PASSENGERS.**

In a suit against a steam-boat to enforce the penalties prescribed by section 4465, Rev. St., for carrying an unlawful number of passengers, it appearing that the persons in excess of the allowed number aboard the boat were intruders against the will of the officers of the boat, and that the boat moved from her landing to another convenient place to avoid a crowd of people who it was feared might force their way upon her and endanger her, *held*, that the penalties were not incurred.

**2. SAME—LIBEL DISMISSED WITHOUT COSTS.**

But there being apparently good ground for the suit, and the case being one proper for judicial investigation, and, moreover, the answer not explicitly setting forth the real ground of defense, *held*, that while the libel must be dismissed, it should be without costs to the respondent, who also was adjudged to pay certain costs.

In Admiralty.

*Samuel M. Raymond* and *Joseph A. McDonald*, for libelant.

*Bird & Porter*, for respondent.

ACHESON, J. This is a suit against the steam-boat Geneva, to recover penalties imposed by section 4465 of the Revised Statutes,— and made a lien by section 4469,—alleged to have been incurred by reason of carrying upon the steam-boat a greater number of passengers than is stated in her certificate of inspection and the special permit for excursions issued to her under section 4466. The libel charges "that on the eighteenth day of October, 1885, while the said steam-boat was plying as a passenger boat on the Ohio river and its tributaries, to-wit, between Pittsburgh and Davis Island dam, the said boat received and carried passengers to an amount in excess of the numbers allowed, of two thousand or more." The testimony is very voluminous. To recite it at any length or analyze it I shall not attempt. This would expand the opinion of the court unreasonably. I must confine myself to a bare statement of the facts, (for the most part,) with the conclusions I have reached after a patient investigation of the whole case.

The respondent Lewis N. Clark, the master of the Geneva, and one of her owners, had planned a Sunday excursion on the aforesaid

date, to Davis Island dam, with the Geneva, and the barges Alice and Edna in charge of the steamer Twilight; one of the attractive features of the occasion being an aquatic exhibition for the amusement of the excursionists by Captain Paul Boyton at Davis Island dam, or at such other point on the way as Clark might select. The Geneva lay at the foot of Wood street with her bow towards the shore. . To her larboard or lower side was attached a coal-flat from which she had taken fuel. This flat extended down to the Parkersburgh wharf-boat, which, at the upper end, was connected with the shore by a staging. The excursion barges, Alice and Edna, with the steamer Twilight, lay below this wharf-boat. The excursion was advertised to leave the Pittsburgh wharf at 2:30 o'clock P. M. By that hour an immense concourse of people had assembled in the immediate neighborhood of the boats. The number of passengers the Geneva was authorized to carry was 300. The regular mode of receiving passengers on the boat was by a gang-plank extending from her bow to the wharf. The tickets for the trip on the Geneva were sold by William Brenneman, the clerk of the boat, at the foot of this gang-plank, and they were taken up by an agent of Boyton, who stood on the bow of the boat at the head of the plank. Both Clark and Brenneman testify—truly, I doubt not—that the former gave a positive order to the latter to cease selling tickets for the Geneva, and take in her gang-plank as soon as 300 tickets were sold; and there is satisfactory evidence that this order was strictly obeyed. But after the gang-plank was taken in a large number of persons got aboard the Geneva by way of the wharf-boat, and thence over the coal-flat already mentioned, and others got on the steam-boat from skiffs which plied between the shore and the upper side of the boat. It is impossible to determine from the proofs the exact number of persons who were on the Geneva when, as hereafter related, she backed out from the wharf. No one pretends then to have made a count of the people aboard of her, and such of the witnesses as speak of numbers give estimates only. The libelant's witnesses greatly differ in this particular; their estimates ranging from 500 to 1,500; one witness, perhaps, naming so high a number as 2,000. It is not surprising that there should be such discrepancy in a matter of mere opinion, especially in view of the confusion and excitement which prevailed that afternoon. The observation of Mr. Shepler, the engineer at the Monongahela House, deserves here to be pondered:

"The position [he says] in which the Geneva was lying—head on—when I went down the second time, was such that you could form but a very poor idea of the number on board, as 150 people on all three decks, crowded to the front, would make her appear very full."

It is shown that there were less than a dozen of persons in the cabin. Almost every body was on deck, sight-seeing, and most of the people were on the hurricane deck. It is indeed shown that the

steam-boat subsequently listed over, so that one of her guards took water, but this was occasioned by the people crowding to that side of the boat; and Mr. Neeld, one of the United States local inspectors of steam-boats and an experienced river man, testifies that less than 200 persons might so list the boat. A careful consideration of the proofs leads me to the conclusion that they justify the finding that the number of persons aboard the Geneva, exclusive of officers and crew, was 500. Higher, it would not be safe, in my judgment, to put the number. Whether the master or owners of the Geneva were legally responsible for this overcrowding of the steam-boat is now to be considered.

About the time the gang-plank of the Geneva was taken in, Capt. Clark, then on his way down to the other excursion boats, stopped at the Parkersburgh wharf-boat, and requested Peter Walter, the man there in charge, not to permit any person to pass over the wharf-boat to the Geneva; and it is abundantly shown that Peter and his assistants did put forth every possible effort to prevent the people from going over the wharf-boat, but in vain. They pressed on and over it to the Geneva in spite of all opposition. The situation is thus described by Peter: "Had I had two cannon with grape and canister I could have kept the people off, but not otherwise." Finally, to stop the crowd, the staging of the wharf-boat was thrown into the river. Doubtless many of the people who got on the Geneva by way of the wharf-boat and over the coal-flat had tickets for the excursion; but I am satisfied they bought them at points lower down the wharf, and for the excursion barges Alice and Edna. John Armstrong, the engineer of the Geneva, testifies that he saw other persons, besides those already mentioned, coming from the Alice, along the outside guard of the wharf-boat, and getting on the Geneva. His estimate is that 200 persons got on the Geneva by way of the wharf-boat, and at least 50 out of skiffs. His position on the lower deck gave him excellent opportunities for seeing. His testimony as to persons getting on the steam-boat by these irregular methods is well sustained by much other evidence. Thus, Richard Jones, the keeper of a boat store at No. 111 Water street, who himself got on the Geneva by way of the wharf-boat without paying, testifies that he thinks he saw 200 persons do the same thing.

The libelant contends that he has shown that the persons who came aboard the Geneva by way of the wharf-boat and by skiffs did so by permission of the officers of the Geneva, and that tickets or fares were collected from them by authorized parties. No doubt the libelant's witnesses who testify to this effect are honest enough, but I am entirely satisfied that they are mistaken. The clear weight of the evidence here is with the defense. At this particular time Capt. Clark was out on shore, and Thomas Boland, the mate of the Geneva, was the officer in command. He strikes me as a very candid and truthful witness. According to his statement,—and he is fully corrobo-

rated by disinterested witnesses,—he and his subordinates exerted themselves to the utmost to prevent persons getting on the steam-boat after the gang-plank was pulled in. Save in the case of three or four ladies, all who entered the Geneva otherwise than by the gang-plank did so against the remonstrances and despite opposition of the mate and crew of the boat; and under all the proofs I have no hesitation in finding that all the persons beyond the authorized number of passengers who came on board the Geneva did so without the consent and against the will of her master, officers, and owners, and despite all reasonable efforts then possible on their part to prevent it.

That it may not be thought that I have overlooked the fact, it is proper just here to state that there is evidence that a few passengers (estimated by libelant's witness Louis Garber at from 15 to 20) were already scattered about the Geneva when Brenneman went out to the foot of the gang-plank to sell tickets; but, as an offset to this, it appears that some two dozen persons who there bought tickets from Brenneman did not at the time go aboard the Geneva, and it does not appear they went, on her at all. Moreover, a few persons left the boat about that time.

When Capt. Clark was informed that the people were forcing themselves on the Geneva, he at once returned to the boat and took command. At this juncture, the steamer James G. Blaine came to the wharf, landing immediately above the Geneva. The crowd on the wharf at once made a rush for the Blaine, and many boarded her, some of whom jumped from her to the Geneva. There was an immense mass of people on the wharf in front of the Geneva, and there was danger of their forcing their way upon her. Capt. Clark therefore backed his boat out into the river,—grazing the Blaine as he did so,—and took the Geneva a few hundred yards—the space of about two squares—down the wharf, landing at or near the mouth of Ferry street. There Boyton gave his exhibition. Many people, by persuasion of the officers of the boat or because of their own apprehensions, here left the Geneva. After Boyton's exhibition was over the Geneva made her excursion to Davis Island dam and back, but her passengers on the trip, it is shown by actual count, numbered less than 200.

Mr. Neeld, when asked what, in his judgment, was the proper course for Capt. Clark to pursue under the circumstances just detailed, when the Geneva lay at the foot of Wood street, answered: "To do just as he did do,—back out from the crowd. That's what I would have done had I been captain of the boat." I have no doubt that this judgment is sound. If Capt. Clark had remained there, it would have been at the risk of sinking or capsizing his boat, to the great loss of human life. It was impossible for him to disembark his passengers at that time and place; nor had he the force to expel intruders. Indeed, had he attempted such a thing it must have brought on a serious riot. There were many rough characters in that crowd, both on and off the Geneva. Capt. Clark, therefore, was in the strict line of.

his duty when he moved the Geneva from the mouth of Wood street down to Ferry street; and, as the persons aboard the boat in excess of the excursion permit were intruders, whom he carried against his will and under a species of compulsion, the penalties prescribed by the act of congress were not incurred.

The libel, therefore, must be dismissed,. but without any costs to the respondent. Moreover, besides paying the commissioner's fees for his own testimony, the respondent must be adjudged to pay the expenses of the watchman employed by the marshal to ·take charge of the boat. Several reasons justify such order. There was apparently good ground for instituting this suit. Indeed, judicial investigation seemed to be demanded. Besides, had the respondent's answer been more explicit, and set forth the real ground of defense, the time occupied by this investigation might have been shortened very much. Let a decree be drawn in accordance with the foregoing opinion.