### THE CHARLES NELSON.

(District Court, W. D. Washington, N. D.   December 28, 1906.)

#### No. 3,259.

1. Shipping—Steamer Carrying Excessive Number of Passengers—Liability to Penalty.

A steamship which left San Francisco for Seattle a few days after the destruction of the former city by earthquake and fire *held* not subject to the penalty prescribed by Rev. St. § 4465 [U. S. Comp. St. 1901, p. 3046], for carrying more steerage passengers than the number allowed by her inspection certificate, nor liable to such passengers in damages for the inconvenience and privation resulting to them from the overcrowding and from a shortage of water, where the excess of passengers was due to the confusion caused by the destruction of the city and the company's office, and occurred notwithstanding its efforts to prevent it, and the shortage was due to the company's inability to procure water or sufficient coal for its condenser in San Francisco, and to bad weather which prolonged the voyage.

2. Same—Discretion of Court.

A court of admiralty may, in the exercise of a judicial discretion, refuse to impose on the owner of a steamship the penalty prescribed by Rev. St. § 4465 [U. S. Comp. St. 1901, p. 3046], for carrying more passengers than the number allowed by the vessel's inspection certificate, where, because of extraordinary conditions existing, such imposition would be inequitable.

In Admiralty. Suit in rem by passengers to recover damages for failure of the carrier to furnish suitable accommodations and food on a voyage at sea, and also to recover penalties under section 4465, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3046], for the carrying of an excessive number of passengers. Hearing on the merits. Libel dismissed.

James Kiefer, for libelant.
Kerr & McCord, for claimant.

HANFORD, District Judge. There are 10 libelants in this case, all of whom were steerage passengers on the steamship Charles Nelson, on a voyage from San Francisco to Seattle in the month of May, 1906. The libel charges that the steerage passengers suffered a great deal of discomfort on the voyage, caused by crowding the decks with freight, and inadequate room, and an insufficient number of berths for the steerage passengers, and lack of a sufficient supply of drinking water and food improperly cooked and not served nicely. For this cause the libelants claim damages and return of the amounts paid for their tickets. The libel also charges that there was received and carried on board the ship 14 steerage passengers in excess of the number limited by the ship's inspection certificate, and for this cause they claim the penalties prescribed by section 4465, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3046].

The evidence proves that the voyage was two or three days longer than the time usually required by steamships for making the run from San Francisco to Seattle, and that there was a great deal of discomfort among the steerage passengers. The voyage was prolonged by reason of stormy weather, and the discomforts complained of were partly incident to bad weather and partly to overcrowding of the steerage quarters. It is the opinion of the court, however, that the extraordinary conditions existing at San Francisco when the voyage was undertaken justify and require the exercise of judicial discretion and that according to principles of equity the libelants are not entitled to prevail. The evidence fully sustains the following statement, contained in the respondent's answers to interrogatories propounded by the libelants:

"For answer to interrogatory 1: Tickets were offered for sale at the office of the Charles Nelson Company in San Francisco, at the Stewart Street Dock, and at No. 918 Broadway, Oakland, Cal.

"For answer to interrogatory No. 2: There were sold in the manner hereinafter stated, and not otherwise, at least 27 steerage tickets for the voyage of the Charles Nelson begun May 2, 1906. Further answering said interrogatory, claimant states that a few days prior to the sailing of said vessel the city of San Francisco was practically destroyed by earthquake and fire; that the docks in said city were largely destroyed, and the place of business of the claimant was totally destroyed; that the usual ticket agencies in San Francisco where the claimant sold tickets for voyages to Puget Sound were destroyed by fire; that for the accommodation of parties desiring to leave San Francisco by steerage on the vessel Charles Nelson, and in the light of the great disaster in San Francisco, the claimant reduced the fare for steerage passengers on said trip, and to accommodate intending purchasers offered tickets for sale at Oakland, as well as at its office and at the dock in San Francisco; that the claimant, on account of the destruction of its place of business, was at that time unable to obtain offices in the city of San Francisco, and was maintaining an office in Oakland, Cal.; that up to a time subsequent to the time when said vessel sailed there was no telegraphic or telephonic communication between Oakland and San Francisco, and no means of communicating other than by special messengers, and on account of the confusion due to the fire and earthquake it was exceedingly difficult to communicate with the claimant's several agencies by private messenger; that a few hours before said steamer sailed there had been sold at its Oakland office for said voyage 15 steerage tickets, and the claimant learned that 7 tickets had been sold at the Stewart Street Dock in San Francisco; that as soon thereafter as it was able to get into communication with its agencies in San Francisco the claimant withdrew all tickets from sale, and directed the agents to refund to holders of tickets above 16 the purchase money.

"For answer to interrogatory No. 3: Claimant states that the said steamer Charles Nelson sailed from San Francisco on said voyage at 11 o'clock p. m. May 2, 1906; that the earthquake and fire in San Francisco had destroyed all of the electric light and gas plants in the city, and the pier from which said vessel sailed was unlighted, and there were no means or facilities for lighting same; that about 1 o'clock p. m. the claimant began taking passengers aboard said vessel; that the captain of the said vessel placed at the gang plank the steward, Mr. Elliott, and specifically directed him, in the light of the fact that more than 15 steerage tickets had been sold, to admit but 16 steerage passengers, and the said steward, after checking aboard 16 steerage passengers, refused to admit any other steerage passengers aboard said vessel, and directed all thereafter appearing with tickets to return to the agency where they had purchased the same and informed them that their money would be refunded; that some of the steerage passengers refused admission to said vessel left the dock, and others remained about the dock; that the claimant and its officers used all due diligence to prevent any more than 16 steerage

passengers to take passage on said vessel; that in the darkness of the night, by reason of the unlighted condition of the dock, it was ascertained on the morning of the 3d of May, when the tickets were collected on said vessel, that 11 steerage passengers in excess of the 16, and 3 stowaways, had come aboard said vessel without the knowledge or consent of its owners; that said vessel was then at sea, and a distance of more than 100 miles from the port of San Francisco and had until a short time prior thereto a small schooner in tow; that it was impracticable at that time for the said vessel to return to San Francisco.

"For answer to interrogatory No. 4: The claimant states that on the next morning after said vessel sailed it was discovered that there were 3 stowaways aboard said vessel, who were required by the master thereof to work their passage to Seattle, and they were berthed in the lazarette with the crew.

"For answer to interrogatory No. 5: Claimant states that said vessel was allowed to carry 16 steerage passengers.

"For answer to interrogatory No. 6: Claimant alleges that it had berths or bunks equipped with mattresses for 16 steerage passengers on said voyage.

"For answer to interrogatory No. 7: Claimant states that the said vessel at no time had furnished blankets for steerage passengers; that it never has furnished any other equipment than bunks, with mattresses, as aforesaid.

"For answer to interrogatory No. 8: Claimant states that the table and mess accommodations for steerage passengers aboard said vessel on said voyage and all other voyages was the messroom of the crew, where there were tables and accommodations to seat 8 persons at a meal, and in this connection further states that the steerage passengers on the said voyage preferred to have their meals served on the after hatch rather than wait their turn in the messroom, and that their meals were served on the after hatch, in accordance with their desires, and no one of said steerage passengers on said voyage ever made any complaint to any officer of said vessel by reason thereof."

The evidence also proves that the ship could not obtain fuel, nor fresh water, at San Francisco. Her condensing apparatus afforded the only means of furnishing fresh water, and by reason of the extra time consumed in making the voyage her supply of fuel was nearly exhausted when she arrived at Seattle, and the necessity for economizing fuel prevented the continuous working of her condenser, so that there was a scant supply of water. Her officers, however, did the best they could under the circumstances for the comfort of the passengers.

The appalling disaster which suddenly rendered a great multitude of people in San Francisco homeless and destitute is a matter of common and general knowledge, and due credit should be given to the generous impulses of officers and managers of railroads and steamship lines which prompted them to make extraordinary exertions to facilitate the emigration of the many who hastened to leave the ruins and desolation which surrounded them in that city. It is plainly apparent that the desire of the libelants to get away from San Francisco was too strong to admit of any questioning of the sufficiency of the accommodations afforded by the Charles Nelson before going aboard of her, and their demands are as ungracious as would be the case if they had been castaways, and were suing a rescuing ship which had brought them away from a desolate shore. The evidence proves that the officers of the Charles Nelson did not intend to oppress the libelants, nor to violate the law by receiving on board an excessive number of passengers, and that the overcrowding of the ship was occasioned by the intrusion of those who came on board in the darkness. After the

number of passengers which the ship was authorized to carry had been admitted, the captain had refused to receive an additional number.

For this reason, I direct that a decree be entered dismissing the suit, at the libelant's costs.