### THE MELVILLE.

#### (Circuit Court of Appeals, Ninth Circuit.　May 4, 1914.)

#### No. 2362.

SHIPPING (§ 168*)—CARRIAGE OF PASSENGERS—STATUTORY PENALTY FOR OVERLOADING.

> While a tug was taking on a small invited party to witness a launching, other people who were waiting on the pier climbed on the boat and, refusing to leave, ·were taken a quarter of a mile to the place of the launching and return. They were charged ·no fare. The entire number on board exceeded that named in the boat's certificate of inspection. *Held*, that under the circumstances the case was not within the meaning of Rev. St. §§ 4465, 4499 (U. S. Comp. St. 1901, pp. 3046, 3060), and the boat was not subject to the penalty imposed by the latter section for overloading.
>
> [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 556–562; Dec. Dig. § 168.*]

Appeal from the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Suit in admiralty by the United States against the steamer Melville; the Callender Navigation Company, claimant. Decree for respondent, and libelant appeals. Affirmed.

Clarence L. Reames, U. S. Atty., and Robert R. Rankin, Asst. U. S. Atty., both of Portland, Or., for appellant.

G. C. Fulton, of Astoria, Or., for appellee.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before GILBERT and ROSS, Circuit Judges, and VAN FLEET, District Judge.

ROSS, Circuit Judge. Sections 4465 and 4499 of the Revised Statutes are as follows:

"Sec. 4465. It shall not be lawful to take on board of any steamer a greater number of passengers than is stated in the certificate of inspection; and for every violation of this provision the master or owner shall be liable, to any person suing for the same, to forfeit the amount of passage money and ten dollars for each passenger beyond the number allowed."

"Sec. 4499. If any vessel propelled in whole or in part by steam be navigated without complying with the terms of this title, the owner shall be liable to the United States in a penalty of five hundred dollars for each offense, one-half for the use of the informer, for which sum the vessel so navigated shall be liable, and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense."

To recover the penalty of $500 provided for in the section last quoted, the government libeled the steamer in question, which is a large steam tug, for taking on board and carrying, on a certain stated occasion, more passengers than permitted by its certificate of inspection, which authorized the carrying thereon of 75 passengers only. On the hearing of the evidence given on behalf of the respective parties, the court below dismissed the libel, and the government has brought the case here.

The material facts are undisputed, and the merits of the matter may be fairly judged by this extract from the testimony of the witness Callender, who was the secretary and general manager of the claimant company:

"Q. I wish you would detail to his honor here the facts pertaining to the taking and carrying of these passengers with which you are charged. Just explain it. A. Well, I invited a few of my own friends in Astoria to make that trip, to go up and see the launching of this big ship. As long as it had been the first one that was launched in the Columbia river, it was quite an event. I think there were about 12 or 15 of us took the boat in the morning, and figured on getting up there possibly an hour before the launching— figured on looking around the mill. We were a good deal longer coming up than we figured on. There was a pretty good current in the river. When we arrived at St. Helen's dock, was going by there, we realized it was just about the time the ship was to be launched. Going by the wharf there, we saw quite a number of people on the wharf, and we heard somebody hallooing. And I looked over there and saw several of my friends there—Mr. Morton, Mr. Yeon and Mr. Brady, and Mr. McCormack, and two or three people from Astoria, Mr. Halterman, and several others. So I sung out to the captain to swing around and make a landing, and we would pick those people up. As we went in there was a wide slip, possibly 10 or 15 feet wide. As we started to go in there, these people began to jump into that slip. We ran the nose of the boat in there, and Mr. Morton was pretty well back of the crowd with his folks, and in trying to get them through the crowd, and get them down there, of course everybody began to jump aboard. I tried to hold them back. They all hallooed there was no other boat—'We can't get up there.' In our efforts to get Mr. Yeon and Mr. Brady and Mr. Morton and the ladies aboard, this crowd kept piling in. I didn't realize there was anybody coming on top of the boat till, after we started to back away, I saw a whole crowd of them on the boat, jumping over on top of our house. Of course, we tried to stop them just as soon as I saw the rush. But when they started to crowd into the slip there like a lot of cattle, people on the back end of the slip shoving the front ones aboard the boat, if the boat had pulled away very suddenly

it would have pulled them all overboard. As soon as we stopped and got our boat away, we backed right away. We didn't have lines out or anything else. We just had her nose up against the dock. We stopped and backed her away as soon as we could, till they realized they was going to get overboard, then they hallooed, 'Quit.' We proceeded up close to the dock and along close to the log rafts. I don't think any of the time we was more than two or three lengths of the boat away from the shore. We tied up to the log raft right across from where the launching took place. As soon as the steamer was in the water we went right back to the dock and put this crowd off. I don't think it was over a quarter of a mile from the wharf up to where the ship was launched. It possibly might be a little more, but I don't think it is.

"(Examination by the court:)

"Q. You took the same crowd back that went over? A. Yes, the same crowd went back. I don't think anybody got off. Of course, there were a few people, after the boat tied up to the log raft, got off. I did. I was in the lumber business. While I was waiting there for the launching, I got off on the raft, and several people got off.

"Q. Were there any people on the raft? A. I think there were. There was a lot of these little fishing boats and pleasure boats, and two or three rafts of logs all up and down the slough, quite a number of boats tied up there, and people walking around on the raft, as I remember.

"Q. Do you remember whether any more people got on your boat? A. No, I am satisfied there wasn't anybody got on there. I don't think they did.

"Redirect examination:

"Q. Was there any charge made for any of these people? A. No charge at all. We were simply out for a picnic.

"Q. Would you have permitted these people to have gotten aboard could you have avoided it? A. I should certainly not. I didn't want them aboard there. We had a little party of our own, and we had some refreshments served in the cabin there, some sandwiches and things. We were just having a little party. I didn't want any strangers aboard the boat. I didn't know these people."

The fact is undisputed that more than a hundred people got on the tug and were carried by it, under the circumstances stated; but we agree with the court below that those circumstances were such that the case is not within the meaning of the prohibition contained in section 4499 of the Revised Statutes, above quoted, which contemplates, in our opinion, the voluntary taking on board any more than the permitted number of passengers, and not a case of the nature here presented, which conclusion finds support in the cases of The Nelson (D. C.) 149 Fed. 846, and The Geneva (D. C.) 26 Fed. 647.

The judgment is affirmed.